Good morning, Your Honors. My name is Stephen Volker. I'm appearing on behalf of Plaintiffs and Appellants Tri-Valley Cares. I wish to reserve five minutes for rebuttal. Am I correct, and is the Court correct in assuming that you have both received copies of our order directing you to be prepared to address the recent San Luis Obispo v. NRC case? Yes, thank you very much, Your Honor. I believe that the San Luis Obispo Mothers for Peace case controls your ruling in this case. In Mothers for Peace, the plaintiffs contended that the Nuclear Regulatory Commission had failed to assess the potential for and possible impact on the environment of terrorist attacks on the Diablo Canyon nuclear power facility in California. This Court held that NRC had violated NEPA by failing in its environmental assessment on that facility, and specifically the storage of waste in casks at that facility had violated NEPA by failing in its environmental assessment to address the potential for a terrorist attack and the potential impact of a terrorist attack. NRC raised four defenses against the plaintiffs' contention in that case. This Court rejected each of them. In its ruling rejecting those defenses, this Court held that the government's argument that the impact or likelihood of a terrorist attack was speculative and remote did not exist. This Court excused its failure to address that potential impact in an environmental assessment. The defendants argued that it was difficult to quantify the likelihood of such an adverse impact in the Mothers for Peace case. Again, this Court rejected the excuse on the grounds that NEPA does not require specific quantification of the likelihood of a specific impact, that rather NEPA calls for the application of a rule of reason that where, as here, the government concedes that there is a possibility of such an attack, that the government must then explain in its environmental review the general parameters governing the likelihood of an attack and the potential consequences of an attack. Counsel, one, I have not read the underlying document in that other case, but only the case itself. But my impression was that the environmental assessment in that case did not include an analysis at all of what would happen in the event of a terrorist attack or catastrophic event of that kind. By contrast, in this case, starting at page 48 of the environmental assessment, there is a discussion of what would happen in the event of a catastrophe, an accident, an accidental release because of earthquake or other cause. And I guess I wonder whether it matters what that cause is so long as the analysis occurs of what if there's a big problem of some sort and there is a release. And then what? And it seemed to me that there was such an analysis here, even though it's tied to earthquakes and accidents and other things being the more likely reason for that. Does that distinguish the other case? And if not, why not? Your Honor, I believe the facts are different from those that Your Honor has recalled. Let me explain. In this case, the government admitted in its responses to comments at 1ERC2, appendix C, page 12, that, quote, the potential results of terrorist attacks are not currently included in defendants' NEPA analyses because terrorist events are not reasonably foreseeable accident events in the sense that a probability of occurrence could be determined for a NEPA analysis. Now, that excuse, Your Honor, tracks pretty closely the excuse proffered by NRC in the Mothers for Peace case. So if I understand it, the part that I'm reading, you're saying wouldn't necessarily be the same analysis on the merits of it if they were to look at the sabotage or something like that. It might be actually different physical phenomena and they just haven't looked at it. Is that? That's correct, Your Honor. And perhaps I could assist the Court by giving an example of the very significant difference between the two analytical pathways. Where the government conducts an assessment of the likelihood and potential effect of a terrorist attack, it would have to consider, for example, the use of a plane, as in 9-11, or a truck, as in the Oklahoma City bombing. Those scenarios were not addressed at all in this case. Instead, the Department of Energy employed a one-size-fits-all maximum credible event scenario borrowed from another agency. The MCE, maximum credible event scenario, was not intended to address the impact or likelihood of a terrorist attack or sabotage. Instead, it assessed merely the impact of a laboratory technician's failure to screw tightly six centrifuge tubes, releasing into the confined laboratory environment a small quantity, less than a liter, it appears, of Q fever. And that most of the Q fever would solidify and only a small percentage would aerosolize. But the killer here, Your Honor, is that the analysis employed by the government assumed that 100 percent of the tiny, the minute quantity that was aerosolized would have to pass through two HEPA filters before escaping to the outside. Which, of course, would not be true if a plane blasted the whole thing apart, is your point? Exactly right. And a number of scenarios can be readily brought to mind, Your Honor, that would result in a breach of containment without any need to speculate wildly. For example, the government's own documents in this case established that an average of four percent or three-point-something percent of HEPA filters examined at the Lawrence Livermore Lab were faulty and were not withholding or containing pathogens that they were intended to contain. After the 1980 quake on the nearby Greenfield Fault, fully eight percent of the HEPA filters at the facility were not performing. According to the expert testimony of Marion Folk, which was permitted by the court and considered, 12 percent of the HEPA filters at Lawrence Livermore Lab do not function. This is due to a variety of factors. They become brittle with age. They don't work. Okay. So I won't belabor that, but we have, in addition to just the standard operating feature of this facility that the HEPA filters don't work, any number of foreseeable events, such as fire, earthquake, operator error, internal sabotage, and so on, that could result. Apart from earthquake, because as I understand the nuclear reactor problem, it is very much related to the site where it is, but apart from earthquake possibility here, which has been discussed, I think, in the EA, what is there site-specific that wouldn't happen if, as I understand it, the alternative place where they could build this, there are already a lot of labs like this, as I understand it, around, or some, but, well, the alternative where they would have put this one, would it have been in New Mexico? Is that what they, if the plane slammed into the same lab built in New Mexico, what would be the difference in the result? What is it that, because I thought this stuff, you know, went into the environment. Okay. Good questions, Your Honor. Let me try to address them in order. I believe there were three. First of all, the government failed to examine alternate locations for this proposed facility and only mentioned the Los Alamos National Laboratory in passing, so there was a complete failure to consider alternative sites. Secondly, with respect to the site-specific dangers posed by this facility, the EA stated that the potential to impact the public was remote because the public was at least a half mile from the facility, ignoring, of course, the fact that 10,000 workers are employed every day at Lawrence Livermore and would be in the direct pathway of any release. Third, Your Honor, the environmental assessment does not address the likelihood of ground shaking at this facility that would exceed the design, nor does it consider the possibility that there would be surface displacement of the facility. It states incorrectly that there are no active faults in proximity to the facility, but in fact, the Las Positas Fault is immediately adjacent to the facility, and the Greenville Fault is close enough to cause major structural damage at the facility in 1980, including injury to 44 individuals, massive structural damage, the displacement of mobile structures from their foundations, falling ceiling tiles, broken gas and water mains, and so forth, so that we don't have an honest evaluation. Well, that goes to the ground shaking, but what I'm still trying to get at is the concern that if a plane crashes into this, into a lab, whether it's built here, in Los Alamos, in Nevada, what is the difference in terms of the effect, because it's still going to have all this dangerous stuff contaminate the atmosphere and move? Well, from a layman's standpoint, since we don't have the agency's expert views on this, since they didn't bother to do this analysis, I would think that the first line of inquiry would be, is it possible to fortify such a lab, perhaps put it underground, perhaps put it in a very remote location where the government has the ability to send up fighter jets, for example, to intervene and intersect and interdict any incoming hostile airplanes? These considerations, which seem pretty obvious in a post-9-11 world, were never addressed by the agency. So we have a fundamental failure on the part of the agency to address the very core of ANIPA's command, which is where the public's health and safety is at risk. The government must come clean. It must conduct a dispassionate and thorough analysis of the potential risks and tell the public what they are and, moreover, propose alternative means of addressing the risks so that the public can engage in an informed decision-making process that would hopefully result in the best decision possible. Here, to the contrary, we have a relatively flimsy mobile structure to be transported to the center of the Lawrence Livermore Lab to conduct experiments with highly deadly pathogens. The pathogens are not disclosed specifically. There's no consideration to a host of foreseeable events that could cause a breach in security or a breach in the physical containment of those pathogens. If I might continue, Your Honor, this Court, in the Mothers for Peace case, also rejected the other two grounds advanced by the government to excuse its failure to address in the environmental assessment the potential impact of a catastrophic terrorist attack on the storage casts at the facility. The Court rejected the argument that NIPA doesn't require a worst-case scenario. The Court explained that the CEQ guidelines had been revised to specifically require that the government engage in a reasoned analysis based on credible scientific evidence assessing the potential for such an untoward event and to apprise the public of that. Further, Your Honor, the Court rejected the suggestion that because of the grave security risks posed that the government was under no obligation to disclose to the public what those risks were. This Court held that there is no, quote, security risk, close quote, exception in NIPA, that the appropriate response is for the agency to engage in a proactive assessment of those security risks that could be disclosed to the public, and we have a doubt line a number of them in our briefs, and to assess those in a public forum and to reserve from public view those specific aspects of a security analysis that obviously would hold a potential to expose the public to risk. For example, specific screening procedures where personnel were going in or out of the facility and so forth. And we agree with that analysis, Your Honor. It's exactly the way the course of a reasoned analysis, rule of reason, that would achieve the appropriate result here. Your Honor, if I might, reserve my last four minutes. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Todd Agard, representing the Federal Appellees. I think I'll go right into the issues of the terrorism that Mr. Volcker has raised and that the Court asked about because, to be honest, he's blatantly misrepresented the record here. The Department of Energy specifically discusses many of the situations that he posits, such as, specifically, an airplane crash. DOE said, look, these are pathogens that can be quite harmful in certain contexts, but exposed to the environment where they can be dispersed, where there are temperature impacts, and they are impacted by sunlight, most of these substances become quite innocuous. When you have something like an airplane crash or a fire or an explosion at a facility like this, it would be less detrimental than the catastrophic release scenario that they quantified because the heat effects and the dispersion from that explosion would render the release much more innocuous than would the specific scenario that they looked at. What is your response to counsel's citation to Appendix C, page 12, which says that this scenario is not included? I didn't happen to have that with me, so do you? Actually, he's misread what the record says, and he's been somewhat selective. What there was comments that said you didn't look enough at terrorism, and the agency's response was twofold,  The first thing that the agency said was, look, we can't go into very specific terrorism scenarios, comparing this terrorism scenario to that terrorism scenario. That's not the type of analysis. That becomes inherently speculative. So we can't go and quantify different specific terrorism scenarios. But what we can do, and this is the second response, which Mr. Volker has ignored, what we can do is look at a catastrophic release scenario, and the catastrophic release scenario that we looked in this case encompasses, bounds any reasonable scenario, regardless of cause. Where is that analysis? Page C13, on the same page, C12 and C13, the same page that he was reading from. That's the explanation, but is that the extent of the analysis is on that one page? No, no, no, you're right. That is referring back to the analysis. The description of the maximum credible event analysis is largely on pages 51 to 54 of the EA. The discussion of the other scenarios that wouldn't result in such a release is more on, if you look on page 49 or 50 of the EA. That's where, on page 49, it specifically says, addresses the fire explosion or airplane crashes scenario. So this is not a case at all like Mothers for Peace. Mothers for Peace was a situation where the agency said, NEPA doesn't involve terrorism. That's not what the agency did here. The court was very careful in the NRC case, in the Mothers for Peace case, to say, what we are faulting the agency for here is its categorical decision not to look at the impacts of terrorism. If there's anything that we should all be able to agree about this morning, it's that if you look at this record and the specific mention and response to comments about terrorism scenarios, this is not a case where an agency categorically refused to look at the impacts of terrorism. This is really a technical disagreement between plaintiff's experts and DOE's experts as to if there was a terrorism event, what would the impacts be? It is, I'm sorry, I didn't mean to interrupt because I wasn't looking at you. I wasn't sure that you were still talking. Counsel also disagrees with the assertion that the probability of an earthquake is extremely low. And that, I would submit, is equally. The DOE explained that it was looking at, and I'll give you a citation of the record on page 48 of the EA. DOE said, we have designed this facility to withstand an earthquake that would not occur more than once in 1,000 years. Now, Tri-Valley has come forward. They have found someone that filed an extra record declaration that says, actually, I think that, I'm not sure, maybe a bigger earthquake could happen. But that's just a battle of experts. That's not a failure of the agency to look at the earthquake issue. That's just a disagreement between someone Tri-Valley has found and DOE as to what is the maximum reasonably foreseeable earthquake that could happen here. And I would submit that DOE's analysis here, which was based on, if you go back, it tiered to an earlier EIS that had a more thorough discussion of the seismic impacts. And that EIS is in our supplemental excerpts. But it was relying on USGS calculations that showed the maximum earthquake that would be expected once in 1,000 years. Okay. One thing that's troubling me is that in the looking at alternatives, there was an examination of the possibility of building this in New Mexico. I didn't see that. No, actually, I think that the New Mexico issue was at the time that Tri-Valley originally filed this suit, there was potentially, they challenged two different facilities, a New Mexico facility and this facility. They have since dropped their pursuit of the case again. So I'm looking at the EA where it's considering alternatives. Page 28, where it talks about Sandia Labs and it talks about. Yes, they did. That's right. As their alternatives analysis, they did look at other. But the plaintiffs haven't raised an alternatives argument here at all. No. But what I am asking you is, I do not see in that analysis any discussion anywhere of what seems to be the most troublesome thing here, which is that this is being built in a very highly populated area of northern California. And New Mexico is much less populated. There are many fewer people in the immediate surrounding environment. Therefore, the impact of an attack here would appear to be greater because of the population now than it would be there. And I don't see that addressed. I think that the way that the agency addressed that was it said, we understand that there are, here's the population in the surrounding area. We are going to take that into account in our catastrophic release analysis. What the catastrophic release analysis shows is that because of the rapid dispersal of any release from the facility, is that by the time it reaches a place where any members of the public would be, it's at such a low concentration that it's not going to impact anyone. So it doesn't matter if it's 1 million, 5 million, or 7 million people that are in the surrounding public. The dispersal is such that it's not going to negatively impact them. And now I think that it's important to look at the catastrophic release scenario that they looked at was a very, very conservative analysis. So it picked the most dangerous pathogen that they possibly could. Most of the pathogens and bioagents that would be analyzed at this lab are not anywhere near as durable or as dangerous as this. Where is that analysis? Where is the choice of? That's on the pages 51 to 54. I think it's early in that passage the DOE talks about why it chose this Coxiella brunetti as the pathogen of concern. And it decided that it was the most dangerous because it's highly infectious and unusually stable and durable. And again, I think that what this comes back to is that, and what Tri-Valley is ignoring is. That's the Q fever. Yes, exactly. Coxiella brunetti is another name for the Q fever. So, but I think to, unless the court has further questions about the terrorism analysis or the earthquake analysis in particular, I think what I would take away from that is that you have to really look at the record here and what the agency actually did. Because Tri-Valley is simply not correctly representing the extent of the agency's analysis here. Now, to the extent the court is considering any of Tri-Valley's arguments, I think the first thing it should look at is the extent to which those arguments are relying on extra record declarations. Tri-Valley has submitted at least 29 different extra record declarations in this litigation. And it relies almost entirely on those declarations to make its arguments. Now, in our brief, we directly posed the challenge of that Tri-Valley has never explained why it shouldn't have submitted this information to the agency as part of the administrative record where it would be an appropriate basis for arbitrary and capricious review. And Tri-Valley has not responded. There was a 45-day comment period here. Tri-Valley submitted comments, but it wasn't until after the agency had made its decision that it came forward with the declarations and the analysis that it relies so heavily on in this litigation. The district court allowed a few of those declarations for a minor purpose, but for the most part excluded those declarations. And Tri-Valley does not make any attempt to limit its appellate arguments to those declarations that were actually let in by the district court. I think it's important because that issue is important because record review really goes hand-in-hand with arbitrary and capricious review. As this court has stated in numerous cases, including the ASARCO case that we cited, once you start going outside of the administrative record, what you're really engaging in is de novo review. And so I think I asked this court to decline Tri-Valley's invitation to go outside the administrative record. As I've said, Tri-Valley's criticisms here, again and again, it's not a matter of the agency not engaging, not looking at the issue. They looked at the earthquake issue. They looked at the issue of airplane crashes into the facility. They looked at the issue of explosions. They looked at the issue of other possible releases. These are differences of opinion that Tri-Valley has with the agency, and differences of opinion under the Supreme Court's governing case law and ample precedent from this court as well are not the basis for finding an agency's action arbitrary and capricious. Finally, another way that Tri-Valley characterizes, if you look at their briefs, is they constantly say that DOE has made an assumption. DOE has assumed that an earthquake wouldn't damage the facility. Again, I say the court just has to go back and look at what DOE actually did. DOE made a series of reasoned judgments that are substantiated in the record, and its reasoning is explained in the record. It did not assume that an earthquake wouldn't damage the facility. It designed the facility so that it would withstand an earthquake of the magnitude expected only once in 1,000 years. These were not assumptions made by the agency on any of these issues. The agency went through and analyzed them. Tri-Valley disagrees with that analysis, but it's not an absence of analysis. It's just a disagreement among the parties. Unless the court has any further questions. Thank you. If it pleases the Court, I care to respond to six statements that counsel has advanced. First, with regard to the assertion that the EA addressed terrorist attacks by truck or plane, no such analysis appears within the EA anywhere. The page to which reference was made, page 49, is quite to the contrary. It talks about accident scenarios normally reviewed in DOE analysis, and then it says that those analyses aren't necessary here and won't be done here because it assumed that any statement untoward accident or deliberate sabotage would not result in a release of pathogens to the outside world. With respect to fire, there was a blanket assumption bereft of any supporting analysis that any fire would be sufficiently severe to consume the pathogens. It doesn't take a great imagination to realize that there are a number of scenarios where a fire could result in the release of pathogens. It is admitted in this case that the HEPA filters become unworkable when they become wet, which would happen. If a fire triggered the sprinkler system in this facility, the HEPA filters could not work. If a terrorist attacked the facility, the terrorist would not be assuring that a release of pathogens would pass through two HEPA filters in succession. To the contrary, presumably the purpose would be just the opposite, to spread the pathogens. The council stated that Q fever represents the worst case scenario. Although Q fever is a serious pathogen, there's no evidence in this case that it is the worst, and there was substantial evidence presented by plaintiffs that, in fact, there are other worse scenarios that could unfold. But the key point here is the government steadfastly refused to accept the proposition that any release of any pathogen would not pass through two HEPA filters. With respect to the question whether or not plaintiffs had to raise each and every one of these declarations in comments on the environmental assessment, I would like to make two points. First, the environmental assessment did not provide sufficient information to the public to alert it to some of the grave hazards posed. For example, with respect to earthquakes, the EA said that there were no active faults in proximity to the facility. This is incorrect. The public concerns about earthquake risks were allayed. You are disagreeing with certain of the statements in the assessment, factually. What is we aren't here to nitpick the factual assertions. We are here to determine whether or not they took a hard look at the consequences. That's correct. And so what if you were to point us to one case in which there were these disagreements with factual statements that amounted to a failure to give a hard look, what case would you point us to? Probably Sierra Club v. U.S. Forest Service, 843 F. 3rd. I don't recall the page. A decision handed down by this Court in about 1988. In that case, this Court adverted specifically to declarations presented by the plaintiffs which established that the Forest Service's EA had okay. What specifically is the relief that you seek from us if we were to agree with your arguments? The relief would be a remand to the agency to prepare a proper EA. A proper EA is necessary for the agency to make informed decision about whether an EIS would be required. We believe there's sufficient evidence in this record already to compel this Court to request that the agency prepare an EIS. And I believe that the relief that we would like is if the Court feels that based on this record we have substantial questions raised based on credible scientific information that there is a significant potential for a significant effect on the environment to test under Foundation for North American Wild Sheep, then an EIS should be ordered. If, on the other hand, this Court feels that a more adequate EA, which apparently was the remedy in Mothers for Peace. I'm not sure because the Court's ruling is not specific. But in that case, the Court found that the EA was inadequate. I believe for the same reason that this Court found that EA to be inadequate, the Court, this Court should make a similar finding here. I'm out of time. Thank you. You have your time. Thank you. The case disargued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. I would ask my clerk to come up. I have a note here on the desk for them.  Okay. Thank you.
judges: Schroeder, Graber, Holland